REDACTED

AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

FILED

JUL 16 2020

US DISTRICT COURT
DISTRICT OF DELAWARE

# UNITED STATES DISTRICT COURT
for the
District of Delaware

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

the premises known as
Newark, Delaware 18702

)
)
)
)
)
)

Case No. 20- 178 M

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Please see Attachment A.

located in the _____ District of _____ Delaware _____ , there is now concealed *(identify the person or describe the property to be seized)*:
Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. 2422(b) | Coercion and Enticement of a Minor and Attempted Coercion and Enticement of a Minor |

The application is based on these facts:
Please see attached Affidavit.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Francis Cesare, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephonic conference _____ *(specify reliable electronic means).*

Date: 7/16/2020

*Judge's signature*

City and state:  Wilmington, Delaware

Hon. Jennifer L. Hall, U.S. Magistrate Judge
*Printed name and title*



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES KNOWN AS | Case No. 20 - 178 M |
| NEWARK, DELAWARE 19702 | |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Frank Cesare, a Special Agent with the Federal Bureau of Investigation, being duly sworn, depose and state as follows:

## INTRODUCTION AND BACKGROUND

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedures for a warrant to search: the premises known as ⁻⁻⁻ ⁻        ⁻ ⁻⁻ ⁻ ⁻, Newark, Delaware 19702 (the "SUBJECT PREMISES"), described in Attachment A, for a one (1) terabyte hard drive (the "SUBJECT ITEM"), described in Attachment B.

2.    I have been a Special Agent with the Federal Bureau of Investigation (FBI) since September 2018, and in that time, I have worked on both the Baltimore Joint Terrorism Task Force and the Delaware Joint Terrorism Task Force, where I am currently assigned. During my tenure with the FBI, I have gained experience investigating a variety of federal criminal violations. Among other things, I have conducted or participated in surveillances, execution of search and arrest warrants, reviewed surveillance footage and monitored telephone conversations. Prior to being employed with the FBI, I was a sworn law enforcement officer with the New Jersey Division of Criminal Justice for approximately three years and investigated narcotics violations and other violations of the New Jersey Criminal Code. In addition, for approximately two years, I served as a uniformed law enforcement officer with the United States Capitol Police. My training includes courses at the Federal Training Law Enforcement Center (FLETC), located in Glynco, Georgia;

The New Jersey Division of Criminal Justice Academy, located in Sea Girt, New Jersey; and the FBI academy Basic Field Training Course, located in Quantico, Virginia. In addition, in conducting this investigation, I have consulted with a Federal Bureau of Investigation (FBI) Child Advocate Forensic Interviewer (CAFI) and FBI agents involved in investigations of crimes against children and learned about the motives and common behaviors of child sex offenders.

3.      As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

4.      As discussed in more detail below, there is probable cause to believe that JAMES CROSSAN used a facility of interstate commerce to entice and coerce, and attempt to entice and coerce, a person he believed to be a minor to engage in unlawful sexual activity, to wit, the production of child pornography. The SUBJECT PREMISES are to be searched for contraband, evidence, and fruits of violations of Title 18, United States Code, Section 2422(b) (Coercion and Enticement of a Minor and Attempted Coercion and Enticement of a Minor) (the SUBJECT FEDERAL OFFENSES).

5.      The statements in this affidavit are based in part on information and reports provided by law enforcement, and on my experience and background as a Special Agent of the FBI. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband, evidence, fruits, and instrumentalities of the violations of the SUBJECT FEDERAL OFFENSES are located within the SUBJECT PREMISES.

2

## PERTINENT CRIMINAL STATUTES

6.     This investigation concerns alleged violations of Title 18, United States Code, Section 2422(b), which makes it a federal crime to persuade, induce, entice, or coerce any individual who has not attained the age of 18 years to engage in any sexual activity for which any person can be charged with a criminal offense, or attempt to do so.

7.     This investigation concerns alleged enticement and attempted enticement to produce child pornography. The production of child pornography is prohibited in Title 18, United States Code, Section 2251(a), which makes it a federal crime to persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction thereof, with reason to know that such visual depiction will be transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

8.     The following definitions apply to this Affidavit and Attachment B:

- "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

- "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, tablets, and mobile phones and devices. *See* 18 U.S.C. § 1030(e)(1).

- The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

3

- "Internet Protocol address" or "IP address," as used herein, refers to a numeric or alpha-numeric label used by a computers or other digital devices to access the Internet. For example, Internet Protocol version 4 defines an IP address as a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Another example, Internet Protocol version 6, uses both numbers and letter (e.g., 2001:db8:0:1234:0:567:8:1). Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs", defined below) control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

- "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

- "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

- "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

- "Sexual activity for which any person can be charged with a criminal offense," as defined in 18 U.S.C. § 2427, includes the production of child pornography.

- "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals or pubic area of any person.

- A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

- "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion

4

into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## SUMMARY CONCERNING CHILD PORNOGRAPHY, PERSONS WHO POSSESS AND COLLECT CHILD PORNOGRAPHY, AND HOW USE OF COMPUTERS AND THE INTERNET RELATES TO THE POSSESSION, RECEIPT AND/OR DISTRIBUTION OF CHILD PORNOGRAPHY

9.      Based on my investigative experience and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who utilize the Internet to view, download, and/or distribute child pornography are individuals who have a sexual interest in children and in images of children. In addition, there are certain characteristics common to such individuals, including the following:

a.      Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b.      Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Individuals who have a sexual interest in children or images of children frequently maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.      Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer or cellphone, and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, or in online storage, email accounts, or other online communication accounts, to enable the individual to view the collection, which is valued highly.

5

e.      Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/collectors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. This data is typically in digital format, and often maintained on computers, cell phones and in online storage, email accounts or other online communication accounts.

f.      Individuals who would have knowledge on how to distribute and receive digital images of child pornography through the use of Peer to Peer networks and other online methods would have gained knowledge of its location through online communication with others of similar interest. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images. Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

g.      Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This behavior has been consistently documented by law enforcement officers involved in the investigation of child pornography.

10.     Based on my investigative experience and the training and experience of other law enforcement officers with whom I have had discussions, I have learned the following:

a.      Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. It has also revolutionized the way in which child pornography collectors interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies.) The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls. Any reimbursement would follow these same paths.

b.      The development of computers, smartphones, and the Internet have added to the methods used by child pornography collectors to interact with and sexually exploit children. Computers, smartphones, and the Internet serve four functions in connection with child pornography. These are production, communication, distribution, and storage.

c.      Child pornographers can now transfer photographs from a camera onto a computer-readable format. With the advent of digital cameras, the images can now be

6

transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography.

        d.     Child pornography can be transferred via electronic mail or through file transfer protocols (FTP) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services, easy access to the Internet, and online file sharing and storage, the computer is a preferred method of distribution and receipt of child pornographic materials.

        e.     Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools.[1]

        f.     When a person "deletes" a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.

        g.     The storage capacity of personal computers has increased dramatically over the last few years. Common and commercially available hard drives are now capable of storing over 500 GB of data. With that amount of storage space, an individual could store thousands of video files and/or hundreds of thousands of image files.

        h.     Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Since the storage capacity of hard drives has increased dramatically over the last several years, it is more likely that the above-described information will be recovered during forensic analysis.

---

[1] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (Collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

## PROBABLE CAUSE STATEMENT

### A. DETAILS OF INVESTIGATION

11.     In October 2018, the FBI commenced a covert investigation into CROSSAN regarding unrelated federal offenses.   During the course of that investigation, pursuant to a subpoena, the FBI identified CROSSAN's telephone number as ˙˙          reviewed CROSSAN's toll records for that telephone number, and learned that CROSSAN was communicating with a limited number of individuals.   One of those individuals was unknown to the FBI.  The FBI obtained subscriber information for that telephone number and discovered that the unknown individual was Minor Victim #1, a 17 year-old male who resided in Portland, Oregon. According to toll records, communications between CROSSAN and Minor Victim #1 began in March 2018 and continued throughout the time period encompassed by the toll records, which extended through June 2019.

12.     On or about November 6, 2019, an FBI agent approached Minor Victim #1 and conducted a consensual, non-custodial interview at Minor Victim #1's home, accompanied by Minor Victim #1's mother and father.   During the interview, Minor Victim #1 confirmed his cellular telephone number.   However, Minor Victim #1 stated that he was not in contact with anyone from the East Coast. The FBI asked Minor Victim #1 if he had interacted with CROSSAN on social media.  Minor Victim #1 stated that he had not.  Minor Victim #1 also confirmed that Minor Victim #1's own Instagram username was "Pentexsucks".

13.     After the meeting with Minor Victim #1, on or about January 10, 2020, the FBI discovered an Instagram account with username "Desu_Desu_Uwu".   The FBI learned, in response to a subpoena, that the subscriber information for "Desu_Desu_Uwu" included CROSSAN's telephone number,          ˙.   Accordingly, based on my training and

8

experience, I believe this evidence is indicia that "Desu_Desu_Uwu" is operated by CROSSAN. The FBI also discovered, through publicly available information on Instagram, that "Desu_Desu_Uwu" was "following" Minor Victim #1's account, "Pentexsucks".

14. On or about January 31, 2020, an FBI agent conducted a second consensual, non-custodial interview of Minor Victim #1. When the FBI agent questioned Minor Victim #1 in the presence of his parents, Minor Victim #1 again denied knowing CROSSAN or communicating with anyone using CROSSAN's telephone number. The FBI agent then presented Minor Victim #1 with a screen capture (akin to a photograph of a computer screen) showing a list of Instagram accounts followed by "Desu_Desu_Uwu", including Minor Victim #1's Instagram account, "Pentexsucks". At that point, Minor Victim #1 requested to continue the interview outside the presence of his parents.

15. Once Minor Victim #1 was alone with the FBI agent, Minor Victim #1 explained that he wanted to keep certain aspects of his personal life private from his parents. Minor Victim #1 stated that two years ago, when he was 15 years old, he suffered from depression and suicidal thoughts, and dealt with his mental illness through social media. He admitted that he connected with "Desu_Desu_Uwu" around that time and exchanged telephone numbers with "Desu_Desu_Uwu".[2] Minor Victim #1 explained that his relationship with CROSSAN quickly turned sexual, and that Minor Victim #1 and CROSSAN sent each other sexual images. Minor Victim #1 declined to describe the images further during this interview. Minor Victim #1 described CROSSAN as "aggressive" and "manipulative," and said he felt like CROSSAN was

---

[2] Minor Victim #1 did not state whether he knew that the user of "Desu_Desu_Uwu" was named James CROSSAN. As set forth herein, the FBI has probable cause to believe that the user of "Desu_Desu_Uwu" and        l is CROSSAN. Given that probable cause, hereafter, for clarity, this affidavit refers to the user of "Desu_Desu-Uwu" and        as CROSSAN.

"taking advantage" of Minor Victim #1's mental health issues.

16.    On or about February 25, 2020, FBI agents returned to Minor Victim #1's home to request that Minor Victim #1 be interviewed by an FBI Child Advocate Forensic Interviewer ("CAFI"). Minor Victim #1 and his parents agreed to the interview. That same day, the FBI also executed a search warrant for Minor Victim #1's cellular telephone, the results of which are discussed further in paragraphs 18 - 20 below.

17.    On or about February 26, 2020, an FBI CAFI interviewed Minor Victim #1 regarding Minor Victim #1's relationship with CROSSAN. The voluntary interview took place at the Portland FBI office. In his interview, Minor Victim #1 stated the following:

   a.    Minor Victim #1 first started communicating with CROSSAN in 2017, when Minor Victim #1 was 15 years old and a freshman in high school.[3] MINOR VICTIM #1 told CROSSAN that he was 15 years old and CROSSAN "kind of ignored it." CROSSAN never told MINOR VICTIM #1 his age, but MINOR VICTIM #1 knew he was in his 20s. CROSSAN also never disclosed his name. A couple of months into their communications, CROSSAN began "flirting," "talking sexually," and asking MINOR VICTIM #1 to send pictures of himself to CROSSAN. At first, MINOR VICTIM #1 hesitated to send photos because he was underage and knew CROSSAN was older. CROSSAN responded to this hesitation by threatening to stop talking to MINOR VICTIM #1, swearing, calling MINOR VICTIM #1 names, and making MINOR VICTIM #1 feel like he was wrong for not sending photos. In response to this pressure, MINOR VICTIM #1 started sending CROSSAN photos of himself. Once MINOR VICTIM #1 sent

---

[3] Because MINOR VICTIM #1 did not state the exact date on which he began his relationship with CROSSAN, this Affidavit requests to search the SUBJECT ITEM beginning on January 1, 2018. Likewise, because MINOR VICTIM #1 did not state whether and on what date he permanently ceased contact with CROSSAN, this Affidavit requests to search for data created through the date on which the Search Warrant is executed.

CROSSAN a photo of himself, CROSSAN complimented MINOR VICTIM #1, boosted MINOR VICTIM #1's self-esteem, and asked for more photos.

b. CROSSAN sent MINOR VICTIM #1 photos of himself "way more than once," and he asked MINOR VICTIM #1 for "graphic" photos "way more than once." The CAFI asked MINOR VICTIM #1 to describe the photos he sent to CROSSAN. MINOR VICTIM #1 explained that CROSSAN asked for photos of MINOR VICTIM #1's genitalia and told MINOR VICTIM #1 how to pose, although MINOR VICTIM #1 said he did not pose as directed. In some of the photos they sent each other, MINOR VICTIM #1 or CROSSAN had their hands on their genitalia. In some of the photos MINOR VICTIM #1 sent to CROSSAN, he had almost all of his clothes off "except a shirt or whatever."

c. During MINOR VICTIM #1's sophomore year of high school, CROSSAN asked MINOR VICTIM #1 to send a video of himself "beating off," which Your Affiant understands as common slang for masturbating. MINOR VICTIM #1 was not comfortable sending the video, but eventually "did it" because CROSSAN was "really annoying" about demanding the video. MINOR VICTIM #1 thought CROSSAN would stop asking MINOR VICTIM #1 to send photos or videos once MINOR VICTIM #1 sent the video of himself "jerking off" (another slang term for masturbating). CROSSAN, MINOR VICTIM #1 explained, did not stop.

d. CROSSAN also asked MINOR VICTIM #1 for his home address so CROSSAN could send MINOR VICTIM #1 gifts, and so they could meet in person. MINOR VICTIM #1 told CROSSAN he lived in Portland, but never disclosed his address.

e. MINOR VICTIM #1 explained that most of his communications with CROSSAN took place via Instagram, many using an Instagram account of MINOR VICTIM #1's that was deleted. MINOR VICTIM #1 explained that he sent images of himself via Instagram

rather than text message because Instagram photos were deleted after two views, unless the recipient took a screen shot. MINOR VICTIM #1 also explained that he took most of the photos of himself using an old cellular telephone which he no longer possesses.

18.    The results of the search of MINOR VICTIM #1's telephone revealed text message correspondence between MINOR VICTIM #1 and CROSSAN throughout the period from March 18, 2018, through August 20, 2019.[4]  In addition, the search warrant results also show that CROSSAN and MINOR VICTIM #1 sent each other many multimedia messages (messages which may include photographs or videos), but do not show the content of those multimedia messages.

19.    Text message communications between MINOR VICTIM #1 and CROSSAN confirm that CROSSAN was aware that MINOR VICTIM #1 was a minor.  In correspondence on June 8, 2019, CROSSAN sent MINOR VICTIM #1 a message stating "You're like 16 dude", and on July 6, 2019, CROSSAN sent MINOR VICTIM #1 a message stating "Sounds good for a 16 year old".  In addition, on multiple occasions, CROSSAN mentioned that MINOR VICTIM #1 was in "school", and referenced wondering what MINOR VICTIM #1's parents would think about MINOR VICTIM #1's behavior.

20.    In addition, the text messages between MINOR VICTIM #1 and CROSSAN include evidence of CROSSAN's efforts to entice MINOR VICTIM #1 to send CROSSAN graphic, sexual photos of himself.  The text messages fall into the following general categories: (a) compliments to MINOR VICTIM #1; (b) requests for photos of MINOR VICTIM #1; (c) offers to send MINOR VICTIM #1 gifts; (d) expressions of a desire to meet in person; (e) messages

---

[4] The correspondent Your Affiant has identified as CROSSAN is an individual using the telephone number _____, which, as explained above, is subscribed to James CROSSAN.  In addition, on July 19, 2019, the person using CROSSAN's telephone number sent MINOR VICTIM #1 a series of text messages reading: "My name?" "You know it?" "Wow" "It's James you nerd". James is CROSSAN's first name.

creating the illusion of an intimate, trusting relationship; and (f) explicit conversations about sexual acts. It is Your Affiant's understanding that these types of communications are common methods by which child sex offenders build relationships with minors, wear down minors' defenses, and entice minors to engage in sexual activities including taking and sharing graphic photos. Examples of CROSSAN's text messages within each category are as follows, with typos as they appear in the messages:

a.) **Compliments to MINOR VICTIM #1**: On March 18, 2018, CROSSAN sent MINOR VICTIM #1 text messages stating: "You're cute as hell though" and "it's crazy how cute you are". On April 14, 2019, CROSSAN told MINOR VICTIM #1, "You're so f*** beautiful and I have tears in my eyes that you love me". On July 16, 2019, MINOR VICTIM #1 sent CROSSAN a multimedia message and CROSSAN replied, "Such a cutie pie". CROSSAN later added, in a series of text messages, "You're such a sweetheart", "I'm genuinely happy [to] know you", and "To me you're beautiful and a sweetheart. What's inside counts the most". On July 25, 2019, MINOR VICTIM #1 asked CROSSAN why CROSSAN liked MINOR VICTIM #1, and CROSSAN responded, "I think you're a wholesome subby femboy"[5] and "I [n]ever had feelings for a guy but you're so sweet to me".

b.) **Requests for photos of MINOR VICTIM #1**: On April 13, 2019, MINOR VICTIM #1 told CROSSAN that he was "about to shower", and CROSSAN responded "I already did that. I should of sent you pics before I did. Maybe you should [send] me some." MINOR VICTIM #1 then sent CROSSAN a multimedia message, and CROSSAN replied, "Thank you pentex-chan", which Your Affiant believes is a reference to MINOR VICTIM #1's admitted

---

[5] Your Affiant believes, based on CROSSAN's conversations with MINOR VICTIM #1 and internet research, that "subby" means "subordinate," specifically in the context of a dominant-submissive romantic or sexual relationship, and "femboy" refers to a feminine boy.

Instagram username, "Pentexsucks". CROSSAN added, "I was hoping for a body pic but ok", followed by "I wanna kiss your thighs." Over the course of the conversation, CROSSAN also said "Let me see more . . . Don't be a tease" and "I'll show mine if you show me yours." CROSSAN then escalated the conversation by stating, "I wanna cum for you tonight. I love you so much". CROSSAN then sent MINOR VICTIM #1 a multimedia message and stated, "Your turn", "I need it", "Please". As Your Affiant interprets this conversation, CROSSAN repeatedly asked for photos of MINOR VICTIM #1, including a "body pic" and graphic images that would sexually gratify CROSSAN. In addition to this conversation, on May 27, 2019, CROSSAN sent MINOR VICTIM #1 a series of text messages stating, "I wanna dress you up. You've been talking about it for a while plus you said you wore dresses. Got any pics in them?" On July 6, 2019, CROSSAN asked MINOR VICTIM #1 for "cute pics of you." On July 16, 2019, CROSSAN stated he was "excited to get more pictures from you." Shortly thereafter, CROSSAN more directly stated "Send pics."

       c.)    **Offers to give MINOR VICTIM #1 gifts**: On June 1, 2019, CROSSAN sent MINOR VICTIM #1 a text message stating "I wish [we] talked more . . . If we were closer I would buy you gifts." On July 19, 2019, CROSSAN said, "Remind me to get you something cute to wear on your birthday."

       d.)    **Expressions of a desire to meet in person**: On April 13, 2019, CROSSAN sent MINOR VICTIM #1 a text message stating, "I wanna see you." MINOR VICTIM #1 replied that he had "just sent you a photo of me lol." CROSSAN responded, "I meant irl" and "Would you want me to come over or something?"[6] MINOR VICTIM #1 expressed that he would be embarrassed if they met in person, and CROSSAN responded, "Well you better get over it because I don't want to be just a gay online couple." CROSSAN later added, "I wish I could hold you

---

[6] Your Affiant understands "lol" to be common shorthand for "laugh out loud" and "irl" to be common shorthand for "in real life."

tonight. I could use a hug and a kiss. You make my life worth it." CROSSAN then asked again, "What's stopping us from meeting up?" And MINOR VICTIM #1 replied, "Me being scared and awkward." CROSSAN replied, "But you said you love me." On January 19, 2019, CROSSAN said to MINOR VICTIM #1, "At least tell me the city you live in so I can see how far away you are. Because . . . *maybe* I do want to come over and chill with you and do gay stuff with my internet boyfriend."

    e.)  **Messages creating the illusion of an intimate, trusting relationship**: On April 13, 2019, CROSSAN sent MINOR VICTIM #1 a text message stating, "I wanna run away with you and start a new life". CROSSAN added, "Just tired of being lonely and picked on" and "Please tell me you love me". The following day, on April 14, 2019, CROSSAN told MINOR VICTIM #1, "You're like the only person I feel I can be open with and like I say, you're just the sweetest thing so I'm happy to have you back in my life". On May 22, 2019, CROSSAN asked MINOR VICTIM #1 to "cheer me up" because "I'm feeling down today". When MINOR VICTIM #1 asked what was wrong, CROSSAN said, "Just life. I try to be happy all the time but I feel so alone". Your Affiant interprets these conversations as attempts to make MINOR VICTIM #1 feel like CROSSAN's trusted confidante and to create an illusion of intimacy.

    f.)  **Explicit conversations about sexual acts**: On May 9, 2019, in a series of text messages to which MINOR VICTIM #1 did not respond, CROSSAN said, "Are you telling me you want to get f\*\*\*ed by a big masculine man while you're crossdressing as a qt anime girl?"[7] CROSSAN added, "Be honest with yourself b\*\*ch" and "You're the lewdest person I know". On May 12, 2019, CROSSAN asked MINOR VICTIM #1, "When are you gonna man up and be my

---

[7] Your Affiant understands "qt" to be shorthand for "cutie" and an "anime girl" to be a reference to Anime, a Japanese animation and illustration style.

bottom bf",[8] to which MINOR VICTIM #1 responded, When r u gonna rape me". CROSSAN replied, "After you fill out a legal document so you can't say I actually did rape you". After MINOR VICTIM #1 replied, "Oh you know what I mean", CROSSAN confirmed: "You just want me to dominate you" and "It's hot when you tell me what you like".

21.    In addition to their text message correspondence, the FBI has learned that CROSSAN and MINOR VICTIM #1 communicated on the social media platform Discord. On April 9, 2020, MINOR VICTIM #1 voluntarily sent the FBI screen captures of what MINOR VICTIM #1 identified as communications between himself, using the username "Pentex", and CROSSAN, using the username "Bimmy."[9] The FBI has identified Bimmy as CROSSAN's Discord username. [10]

---

[8] Your Affiant understands "bf" to be common shorthand for "boyfriend."

[9] As stated elsewhere in this Affidavit, MINOR VICTIM #1 has not affirmatively stated he knows the name of the person who uses the telephone number ⸺ ⸺ ⸺, the Instagram account Desu_Desu_Uwu, and the Discord account Bimmy, however, MINOR VICTIM #1 has been clear that he knows the same person uses all three forms of communication. As stated in this Affidavit, the FBI has probable cause to believe that CROSSAN is the user of all three forms of communication, and Your Affiant refers to that individual as CROSSAN herein for clarity.

[10] Your Affiant has attributed "Bimmy" to CROSSAN for the following reasons:

  a) In response to a Grand Jury subpoena, the FBI learned that the Discord account username which displays as "Bimmy" has the full username "Bimmy#4323" and the listed email address " ".

  b) FBI agents conducted a trash pull outside CROSSAN's home address on September 18, 2019, and located packaging material addressed to "Bimmy Jew". This supports Your Affiant's belief that Crossan goes by the name "Bimmy" or "Bimmy Jew" and uses the email address        . The FBI confirmed CROSSAN's home address (               , Newark, DE 19702) through FBI surveillance and a law enforcement database check.

  c) In addition, in response to a Grand Jury subpoena, the FBI learned that                a has IP address activity virtually identical to that of the email address                        . In particular, someone logged onto                    within a minute of logging onto

22.     The Discord conversations MINOR VICTIM #1 shared with the FBI include a message sent from CROSSAN to MINOR VICTIM #1 on January 21, 2019, stating, "Worship me b**ch". CROSSAN then sent MINOR VICTIM #1 two photos of a naked man from the top of the pelvis down to the lower legs. The focus of one of the photos is a flaccid penis. The focus of the other photo is testicles. After sending the two images, CROSSAN sent MINOR VICTIM #1 messages stating: "I'm the best bf, ain't I?" "How does it compare to yours?" and "Do what I told you to do, b**ch". MINOR VICTIM #1 responded "SORRY I'M EATING AAA" and CROSSAN replied, "HURRY UP B**CH. I'm gonna take a shower and when I get back I better see it."

23.     On June 12, 2020, the FBI conducted a search of CROSSAN's residence (the SUBJECT PREMISES), vehicle, and person, pursuant to a search warrant authorized by a United States Magistrate Judge with the District of Delaware. In the course of that search, the FBI seized approximately 25 firearms, firearm accessories and ammunition, two cellular telephones, one laptop computer, a diary, and multiple items identifying CROSSAN's known alias. Among other items, one of the two cellular telephones and the laptop computer were seized from the SUBJECT PREMISES.

24.     The United States Magistrate Court for the District of Delaware also issued a Criminal Complaint and Arrest Warrant for CROSSAN. CROSSAN was arrested on June 12, 2020, and is currently being detained.

---

using the same IP address four times over the time period from October 2019 through January 2020.

d) In response to a Grand Jury subpoena, the FBI learned that ⌐      ˙ ˙ ˙ ˙ ¯ has a listed recovery telephone number of     ˙ ¯ ˙ 1 and the recovery email address ⌐⌐    ¯ ⌐    ··· (i.e., James D. Crossan).

e) As stated elsewhere in this Affidavit, in response to a Grand Jury subpoena, the FBI learned that    ˙ ˙ ˙ ˙    ˙ is CROSSAN's telephone number.

25.     Upon his arrest, CROSSAN was advised of his *Miranda* rights and transported to the Delaware State Police, Troop 2 Station, where he gave an interview.  In the course of that interview, CROSSAN admitted to communicating with Minor Victim #1 and receiving nude images from Minor Victim #1.  CROSSAN also stated Minor Victim #1 contacted CROSSAN at some point in early 2020 and informed CROSSAN that the FBI was investigating him.  In response, CROSSAN admitted to deleting data from his electronic devices.

26.     The FBI is still in the process of searching through the data on CROSSAN's electronic devices.  As of this date, the FBI has uncovered at least two photographs which appear to be still frames from a video.  In the photographs, an individual yet to be identified appears to be masturbating.  While the FBI has yet to identify the individual in the photographs, the individual appears to be of a similar age to Minor Victim #1.

27.     On or about July 5, 2020, Tyler Nelson, CROSSAN's roommate, contacted the FBI and informed the FBI that CROSSAN sent him a letter while incarcerated.  Nelson told the FBI that in the letter, CROSSAN stated Nelson could have any of CROSSAN's personal items left in the SUBJECT PREMISES.  The letter authorized Nelson to do as he pleased with the items.  Nelson located a one (1) terabyte hard drive (the SUBJECT ITEM) in CROSSAN's bedroom within the SUBJECT PREMISES.  According to Nelson, the SUBJECT ITEM bears a piece of tape labeled "not porn."  Nelson offered to give the SUBJECT ITEM to the FBI.

28.     In Your Affiant's training and experience, individuals with incriminating items often attempt to disguise or otherwise hide them in an attempt to evade detection. As such, Your Affiant does not believe the piece of tape labeled "not porn" is dispositive of the data which is actually saved on the SUBJECT ITEM.

**B.  CONFIRMATION OF RESIDENCY**

29.     CROSSAN's driver's license lists his home address as the SUBJECT PREMISES.

30.     CROSSAN's vehicle, a black 2007 Hyundai Sonata with Delaware registration number 252649, is registered to CROSSAN at the SUBJECT PREMISES.  The FBI has observed his vehicle parked outside the SUBJECT PREMISES over the course of surveillance as described below.

31.     The FBI has conducted surveillance on CROSSAN on approximately 14 separate days from July 2019 through June 2020.  Over the course of their surveillance, the FBI has repeatedly observed CROSSAN exit the SUBJECT PREMISES, enter his Hyundai Sonata, and drive to his place of work (an Amazon fulfillment center), and observed CROSSAN exit his place of work, enter his Hyundai Sonata, and drive to the SUBJECT PREMISES.

32.     On September 30, 2019, agents with the FBI and ATF visited the SUBJECT PREMISES to conduct a voluntary interview of CROSSAN about firearms he had recently purchased.  CROSSAN was present at the SUBJECT PREMISES and identified the SUBJECT PREMISES as his home.  When law enforcement officers visited the SUBJECT PREMISES, they observed that CROSSAN had a computer in his bedroom.  CROSSAN also confirmed with the law enforcement officers that he lives at the SUBJECT PREMISES with a roommate, Tyler Nelson.

33.     On or about January 2, 2020, the New Castle County Police reported to the SUBJECT PREMISES in response to an unrelated incident.  Law enforcement spoke with CROSSAN at the SUBJECT PREMISES at that time.

**D.     SUMMARY**

34.     Based on the facts detailed above, there is probable cause to believe that CROSSAN

used one or more electronic devices to entice and attempt to entice a minor to engage in unlawful

sexual activity, in violation of 18 U.S.C. 2422(b) (the SUBJECT FEDERAL OFFENSES). There

is also probable cause to believe that contraband, evidence, and fruits of the SUBJECT FEDERAL

OFFENSES will be found on the SUBJECT ITEM within the SUBJECT PREMISES.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

35.     As described above and in Attachment B, this application seeks permission to

search for contraband, evidence, and fruits of the SUBJECT FEDERAL OFFENSES, that might

be found at the SUBJECT PREMISES, in particular on the SUBJECT ITEM. Evidence might be

found in the form of data stored on the SUBJECT ITEM. Thus, the warrant applied for would

authorize the seizure and search of the SUBJECT ITEM and, potentially, the copying of

electronically stored information, all under Rule 41(e)(2)(B).

36.     *Probable cause.*  I submit that there is probable cause to believe evidence,

contraband, or fruits will be stored on the SUBJECT ITEM, for at least the following reasons:

> a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

> b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

> c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

37.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the SUBJECT ITEM in the SUBJECT PREMISES because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations; computer activity associated with user accounts; electronic storage media that connected with the computer; and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such

21

file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

        c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

        d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

        f.     I know that when an individual uses a computer to access with intent to view, possess, distribute, or receive child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

     38.    *Necessity of seizing or copying entire storage media device.* In most cases, a search

of a premises for information that might be stored on storage media often requires the seizure of

the physical storage media and later off-site review consistent with the warrant. In lieu of

removing storage media from the premises, it is sometimes possible to make an image copy of

storage media. Generally speaking, imaging is the taking of a complete electronic picture of the

computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often

necessary to ensure the accuracy and completeness of data recorded on the storage media, and to

prevent the loss of the data either from accidental or intentional destruction. This is true because

of the following:

> a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

> b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

> c.    Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

39.    *Nature of examination.* Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, and/or otherwise

copying storage media that reasonably appear to contain some or all of the evidence described in

the warrant, and would authorize a later review of the media or information consistent with the

warrant. The later review may require techniques, including but not limited to computer-assisted

scans of the entire medium, that might expose many parts of a hard drive to human inspection in

order to determine whether it is evidence described by the warrant.

## CONCLUSION

40.     Based on the foregoing information, I respectfully submit that there is probable cause to believe that contraband, evidence, and fruits of violations of the SUBJECT FEDERAL OFFENSES as set forth herein and in Attachment B, are currently contained in the SUBJECT PREMISES, more fully described in Attachment A.  I therefore respectfully request that a search warrant be issued authorizing a search of the SUBJECT PREMISES for the SUBJECT ITEM described in Attachment B and authorizing the seizure and examination of the SUBJECT ITEM.

Special Agent Francis Cesare
Federal Bureau of Investigation


Sworn and subscribed before me this _16_ th day of July, 2020.

HONORABLE JENNIFER L. HALL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF DELAWARE

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

The property to be searched is:

a.　　　　　_____ Circle Newark, Delaware, 19702 (the SUBJECT PREMISES). The SUBJECT PREMISES is an apartment unit on the third floor of a multi-unit apartment complex. The exterior of the apartment complex is affixed with beige siding and the building has three floors. Below is a photo of the SUBJECT PREMISES' exterior.



1

## ATTACHMENT B

### PROPERTY TO BE SEIZED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, or the fruits of crime, namely, violations of Title 18, United States Code, Section 2422(b) (Coercion or Enticement of a Minor and Attempt to Coerce or Entice a Minor), from January 1, 2017, to present:

1. A one (1) terabyte hard drive which, as of July 5, 2020, bore a piece of tape labelled "not porn" (the SUBJECT ITEM).

For the SUBJECT ITEM:

    a.  evidence of who used, owned, or controlled the SUBJECT ITEM at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the SUBJECT ITEM, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the lack of such malicious software;

    d.  evidence indicating how and when the SUBJECT ITEM was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

    e.  evidence indicating the SUBJECT ITEM's user's knowledge and/or intent as it relates to the crimes under investigation;

    f.  evidence of the attachment to the SUBJECT ITEM of other storage devices or similar containers for electronic evidence;

    g.  evidence of programs (and associated data) that are designed to eliminate data from the SUBJECT ITEM;

    h.  evidence of the times the SUBJECT ITEM was used;

1

i.  passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT ITEM that are found stored within the SUBJECT ITEM

j.  documentation and manuals that may be necessary to access the SUBJECT ITEM or to conduct a forensic examination of the SUBJECT ITEM;

k.  contextual information necessary to understand the evidence described in this attachment; and

l.  any and all adapters, chargers, or other hardware items necessary to charge the battery, or to maintain the functioning of, the SUBJECT ITEM.

m.  Child pornography and child erotica in any form.

n.  records and information relating to the sexual exploitation of children, including files, correspondence, and/or communications;

o.  records and information showing access to and/or use of the Discord account "Bimmy#4323", the Instagram account "Desu_Desu_Uwu", or the telephone number (302) 312-4711;

p.  records and information relating or pertaining to the identity of the person or persons using or associated with the Discord account "Bimmy#4323", the Instagram account "Desu_Desu_Uwu", or the telephone number (302) 312-4711; and

q.  records, documents, correspondence, notes, and/or any other materials relating to correspondence or contact with any individual purporting to be a minor, including but not limited to electronic mail, chat logs, and electronic messages.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, contraband, and fruits described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

2